CARL TRIPLETT, ADMINISTRATOR OF DIAMOND O. TRIPLETT, DECEASED,
v. THE SOUTHERN RAILWAY COMPANY.

(Filed 12 July, 1933.)

**Railroads D c—Doctrine of last clear chance held applicable, and nonsuit
should have been overruled in this action for wrongful death.**

Evidence tending to show that plaintiff's intestate, an eleven-year-old
boy, was sitting on a cross-tie about twenty feet from defendant's public
grade crossing, that he was grazing a cow which he was holding by a
chain, that he was looking down, and when the train was about fifty
feet from him, got up and stooped over as though doing something, and
was struck and killed by defendant's train, that the engineer failed to
blow for the crossing, and that the track was straight and unobstructed
for a distance of about two hundred yards and that the engineer could
have seen the intestate and the cow for that distance *is held* sufficient to
take the case to the jury on the doctrine of last clear chance, the evidence
tending to show that the intestate was on the track oblivious or other-
wise insensible of danger.

STACY, C. J., dissenting.

BROGDEN, J., concurs in dissenting opinion.

APPEAL from *McElroy, J.,* at October Term, 1932, of WILKES.
Reversed.

This is a civil action, for actionable negligence, brought by plaintiff
against defendant, alleging damages for the death of Diamond O. Trip-
lett, a boy of eleven years of age. The defendant denied negligence
and set up the plea of contributory negligence.

The plaintiff's intestate, on 8 April, 1929, about 6:25 p.m., was killed
by defendant, while operating its passenger train between Winston-
Salem, N. C., and Wilkesboro, N. C. The plaintiff, in his complaint
details his allegations of negligence against defendant, and alleges that
"at the time of the grievances above set forth, the plaintiff's intestate, a
boy of eleven years of age, was sitting, lying down or stooping over a
point within a few feet of the public crossing on the defendant's track
as above described with a cow near him and near the defendant's track,
which he was minding or holding by a chain about twenty feet long,
when said cow either became unruly or frightened at the sudden ap-
proach of the defendant's train, and ran up the defendant's track and
either jerked or threw the plaintiff's intestate down on or near the
defendant's track, or the plaintiff's intestate was endeavoring to loosen
the chain which had become fastened to one of the spikes in defend-
ant's railroad track, within a few feet of the railroad crossing and in
such a condition and position as to indicate that he was in a perilous
condition and position, which position and condition could have been

seen by the defendant's engineer for a distance of four or five hundred yards east of said crossing, the defendant's train approaching the plaintiff's intestate from the east to the west, which condition and position could have been or should have been seen by the defendant's engineer if he had been keeping a reasonable lookout and could have been seen in time for the defendant's engineer to have stopped said train in time to have prevented the death of the plaintiff's intestate, but that the defendant's engineer in charge of said train negligently and carelessly failed to give any warning either by blowing the whistle or ringing the bell to warn the plaintiff's intestate of the approach of said train and negligently and carelessly failed to stop said train in time to prevent the death of the plaintiff's intestate, which could have been done if the defendant's engineer in charge of said train had kept a reasonable lookout, and that by reason of said careless and negligent acts on the part of the defendant's engineer, agents and employees, the plaintiff's intestate came to his death."

Carl Triplett, plaintiff administrator, and father of the boy, testified, in part, as follows: "I am the father of Diamond O. Triplett. He is dead. Died on 8 April, 1929. I was in my kitchen when the train passed on that day, about 6:20 p.m. My home measures 21½ yards from the Southern Railroad track. There is a public crossing of the railroad something like 200 yards from my house, at which there is a stop sign. There is a whistle post above and very nearly even with my house about ¼ of a mile east of mile post No. 97. The whistle post is about 708 feet east of the public crossing. The passenger train was coming west from Winston-Salem to North Wilkesboro. My house is situated on the north side of the railroad track in going west. The public road that crosses the railroad about 200 yards west of my house runs along the north side of the railroad track in going west. The public road runs along from 10 to 25 feet from the railroad track from a point about opposite my house at the crossing a distance of about 200 yards. There is a North Carolina stop sign at the public crossing. J. V. Foster lives on the hill above the crossing. The boy was found 32 feet from the center of the crossing, this is where he was when I got to him. There is nothing along between the public road and railroad anywhere to obstruct the view of person coming up the road to the crossing. The railroad is practically straight from the whistle post to the crossing, just a little curve where the whistle post is located. The view of the railroad from the public crossing east is unobstructed for a half mile. The land is perfectly level upon which the road is constructed. The road is located along the edge of a level bottom. There isn't anything to obstruct the view of the engineer coming up west to this crossing for a half mile or more. The public crossing is used a good deal; it is a

public road and the United States mail passes it every day. I heard the train pass that evening. The engineer did not blow for the crossing. I heard him blow for the quarry, which is about three-quarters of a mile east of the crossing. He gave no crossing blow for that sign neither did he ring the bell. I heard the train stop and ran out of doors. I saw the baggage master and some of the passengers out and they said they had killed a boy. When I got there he was dead, it was my boy.  .  .  . He was lying there about four feet of the track when I got to him. I sent the boy out about 5:00 o'clock that evening to graze the cow; the last time I saw him he was something like one-half of the way between the public crossing and my house, grazing the cow along the public road. Wind was blowing hard that evening; it was blowing down the river east. There is two crossings east of my house between the quarry and my house. The train did not blow for either of these crossings that evening. The crossing at which the boy was struck is west of my house. .  .  . He was a strong healthy boy, had never been sick; he was a smart boy to work, never gave me any trouble. The cow he was driving was a large red cow. The chain that was fastened to her was 20 feet long; it was a grade crossing where the boy was killed. .  .  . His body was found on the south side of the road. It was 32 feet from the center of the crossing to where the body was found; he was found on the side of the road where the public highway runs; he had already crossed the railroad. His body was found only about four feet from the rail on the roadbed of the railroad. The public road runs along parallel with the railroad at this point. .  .  . The main lick that the boy was struck was right behind the left ear, his head was busted plumb around but busted worse behind the left ear."

Loyd Richardson, witness for plaintiff, testified in part: "I saw the train as it come up the river. I saw the boy; he was on the left-hand side of the crossing about 12 or 15 feet, as well or near as I could make out, above the crossing. *He was kind of sitting down on the end of the ties, like he was looking down at the ground.* The cow was down below him, looked like about 12 to 15 feet. The cow was about half way between the public road and the railroad; she was on top of the fill just where it turns over the edge of the fill; I could see the cow plain; the cow was about 12 to 15 feet below the boy, both the cow and the boy were between the road and the railroad; the boy's face was turned towards me when the train was from 50 to 60 feet above Mr. Triplett's house; the boy got up and turned around like he was doing something; you can see a good way down the track down the river from the crossing, some four or five hundred yards. The railroad runs along the edge of the bottom practically level; there is a whistle post on the railroad just opposite Mr. Triplett's house; the wind was blowing down the river and

the train coming up the river; the train did not blow at the whistle post nor did it blow for the crossing; *when the boy got up he got up with his face towards me; he turned around like he was doing something and then stooped down; he was stooped over; the train was coming so quick I couldn't tell whether he sat down or not; I wouldn't be positive about that; he was sitting down and got up and turned around and was down like this (stooped)."*

J. V. Foster testified, in part: "I live on the hill about 200 yards a little northwest of where the boy was killed; I was at home on 8 April, 1929, when the train passed that evening. There is a whistle post about 200 yards east of the public crossing *the train did not blow nor did they ring the bell when it passed that evening the boy was killed.* I was something like 100 yards from the crossing when the train went up that killed the boy. I saw the boy just a few seconds before the train passed. I was going to the spring. *I saw the boy and the cow; the cow was on top of the fill in plain view of the engineer as was also the boy, the boy was sitting seemed to me at the end of a tie.* This is a public crossing and the mail passes there daily. I am not related to the parties and have no interest in the matter. I saw the boy there in that position, as above stated, less than 5 minutes before the train struck him. *When I saw the boy he was sitting at the end of a cross-tie between the two roads on the south side of the railroad about 20 feet from the crossing,* the best I could tell, in my opinion he was between 15 and 20 feet from the crossing. The cow was a large red cow; there wasn't anything to obstruct the view of the engineer from where the cow or boy in the position I saw him from the Triplett house to the whistle post, a distance of about 200 yards."

At the close of plaintiff's evidence the defendant made a motion in the court below for judgment as in case of nonsuit, C. S., 567, which was granted. Judgment was duly signed in accordance with the nonsuit. The plaintiff excepted and assigned error to the judgment as signed, and appealed to the Supreme Court.

*Jones & Brown and Tam C. Bowie for plaintiff.*
*Burke & Burke of Taylorsville, N. C., and J. A. Rosseau of North Wilkesboro, N. C., for defendant.*

CLARKSON, J. We think the evidence sufficient to be submitted to a jury and the motion for nonsuit in the court below should have been overruled.

In *Jenkins v. R. R.,* 196 N. C., 466, speaking to the subject, at p. 469, is the following: "If the jury found from the evidence that the deceased by his own negligence contributed to the injuries which re-

sulted in his death, then there was evidence from which the jury could have further found that notwithstanding such contributory negligence, the proximate cause of such injuries was the failure of defendants to exercise due care, after deceased could have been discovered, sitting on the end of the cross-tie, in an apparently helpless condition, to stop the train and thus avoid the injuries to deceased. The principle upon which the doctrine of the 'last clear chance' is founded, is recognized and enforced in this jurisdiction, as just and necessary for the protection of human life. *Redmon v. R. R.*, 195 N. C., 764, 143 S. E., 829. . . . (p. 470.) It has been the policy of the law, certainly in this jurisdiction, as shown by numerous decisions of this Court, to hold railroad companies, and their employees, in charge of moving trains, to a high standard of duty towards persons who are or who may reasonably be expected to be on their tracks in front of a moving train. This policy is justified as tending to protect human life. That its vigorous enforcement may sometimes result in the recovery of damages in a case where upon its peculiar facts, the plaintiff does not seem to be entitled to damages does not require or justify a relaxation of well settled principles." *Hill v. R. R.*, 169 N. C., 740; *Caudle v. R. R.*, 202 N. C., 404.

In *Allman v. R. R.*, 203 N. C., 660, at p. 663, we said: "There is no evidence sufficient to be submitted to the jury that the plaintiff's intestate was asleep or drunk on the track, or in a helpless condition on the track, or oblivious or otherwise insensible of danger. The plaintiff's intestate was not at a crossing." This matter is fully discussed in *Hill v. R. R.*, *supra*.

We will not comment on the evidence, as the case goes back to be tried by a jury, but we will say that the evidence, direct and circumstantial, on the part of plaintiff indicates, if believed by a jury, that plaintiff's intestate was oblivious or otherwise insensible of danger, and therefore the case should have been submitted to a jury. For the reasons given, the judgment of nonsuit must be

Reversed.

STACY, C. J., dissenting: It was said in *Talley v. R. R.*, 163 N. C., 567, 80 S. E., 44, "that the engineer of a moving train who sees, on the track ahead, a pedestrian who is alive and in the apparent possession of his strength and faculties, the engineer not having information to the contrary, is not required to stop his train or even slacken its speed because of such person's presence on the track. Under the conditions suggested, the engineer may act on the assumption that the pedestrian will use his faculties for his own protection and will leave the track in time to save himself from injury," a position fully supported by innumerable authorities. See especially *Abernathy v. R. R.*, 164 N. C., 91, 80 S. E., 421.

Applying this principle to the facts of the instant case, it seems to me the judgment of nonsuit is correct.

In order to take the case out of the above principle, the plaintiff must show (1) that the deceased was in a position of peril and apparently insensible to danger; (2) that the engineer, by the exercise of ordinary care, could have discovered his plight and stopped the train before reaching him; and (3) that the failure to exercise such care on the part of the engineer was the proximate cause of plaintiff's intestate's death. *Clegg v. R. R.,* 132 N. C., 292, 43 S. E., 836; *Harrison v. R. R.,* 204 N. C., 718. The showing on the part of the plaintiff is not sufficient to carry the case to the jury.

BROGDEN, J., concurs in dissent.