BELLE LEMINGS, ADMINISTRATRIX OF JOE LEMINGS, DECEASED, v. SOUTH-
ERN RAILWAY COMPANY, C. BURT, AND D. H. CALL.

(Filed 28 April, 1937.)

1. **Appeal and Error § 46—**

Where it is determined on appeal that defendants' motions to nonsuit
should have been sustained, other exceptions of defendants need not be
considered.

2. **Railroads § 10—Doctrine of last clear chance held inapplicable to evi-
dence showing contributory negligence continuing to moment of acci-
dent, and that defendants could not have avoided the injury.**

The evidence tended to show that plaintiff's intestate, a man of sixty
years, in good health physically and mentally, sat down upon a crosstie
on the corporate defendant's tracks, where the tracks were straight and
unobstructed for at least 3,000 feet, that he was warned by several
passers-by of his dangerous position, that he responded to the warnings,
but continued to sit on the crosstie with his elbows on his knees and his
head between his hands, that defendant's train, pulled by two engines,
approached at a speed of 40 to 50 miles an hour in violation of an ordi-
nance of the town in which the accident occurred limiting the speed of
trains to six miles per hour, that the whistles of the engines were blown
repeatedly in warning, and that when the train was about 160 feet from
intestate and the engineers realized he was not going to heed their warn-
ing, they put on brakes and exerted themselves to the utmost of their
ability to stop the train and avoid hitting intestate, but were unable to
do so. *Held:* The evidence was insufficient to support the submission of
an issue of last clear chance, since the evidence shows contributory negli-
gence of intestate continuing up to the moment of impact, and does not
show that intestate was in a helpless or even an apparently helpless
condition on the track, and that therefore the engineers had a right to
assume up to the last moment that he would get off the track and avoid
injury, and that when they realized he would not, it was too late to avoid
the accident, although they exerted themselves to do so.

CLARKSON, J., dissenting.

APPEAL by defendants from *Alley, J.,* at September Term, 1936, of
HAYWOOD. Reversed.

This is an action to recover damages for the death of plaintiff's intes-
tate. C. S., 160.

The facts shown by all the evidence at the trial with respect to the
liability of the defendants to the plaintiff for damages resulting from the
death of her intestate are as follows:

About 5 :30 o'clock p.m., on 9 March, 1936, while he was sitting on the
end of a crosstie in the track of the defendant Southern Railway Com-
pany, within the corporate limits of the town of Waynesville, in Hay-
wood County, North Carolina, plaintiff's intestate was struck and killed
by a train owned by the defendant Southern Railway Company and

drawn by two of its engines, one operated by the defendant C. Burt, and the other by the defendant D. H. Call, both of whom were employees of their codefendant.

The train was a "doubleheader." As it approached the crosstie on which plaintiff's intestate was sitting, from a westerly direction, the train was traveling at a speed of 40 to 50 miles per hour, in violation of an ordinance of the town of Waynesville, which prescribed a maximum speed for trains operated within the corporate limits of said town, of six miles per hour. As it approached the point on the track where· plaintiff's intestate was sitting, the whistles on the engines drawing said train were blown repeatedly by the engineers. No effort was made by them to lower the speed of the train until it was about 160 feet from the point where plaintiff's intestate was sitting and where he was struck and killed by the train. He died almost immediately after he was struck and injured by the train. His death was the result of his injuries.

Plaintiff's intestate was about 60 years of age at the date of his death. He was in good health, both physically and mentally. He was a carpenter by trade, and had worked at his trade during the week preceding his death. He left the station in Waynesville about 4 o'clock p.m., on 9 March, 1936, and after walking on defendants' track in a westerly direction for a distance of about 300 yards, he sat down on the end of a crosstie in said track. He continued to sit on the crosstie for about an hour, until he was struck and killed by defendant's train about 5 :30 o'clock p.m. During this time he was warned by passers-by that he was sitting in a place of danger; that it was about time for a train. He was advised by at least two persons, who passed him, to get up from the crosstie and leave. He responded to these warnings and to this advice, but continued to sit on the crosstie. The track from the point where plaintiff's intestate was sitting, in a westerly direction, for a distance of about 3,000 feet, was straight. There was nothing on the track which would have prevented plaintiff's intestate from seeing a train approaching from the west in ample time for him to have gotten up from the crosstie and left the track. There was no evidence tending to show that the sight or hearing of plaintiff's intestate was defective, or that at any time while he was sitting on the crosstie he was not conscious of his peril.

Shortly before he sat down on the crosstie, while he was walking on the track plaintiff's intestate staggered between the rails of the track. After he sat down, he leaned over, with his elbows on his knees, and with his head between his hands. He remained in that position until he was struck and killed by the train. There was no evidence tending to show that any of the persons who saw him as he sat on the crosstie—some of whom knew him—offered him any assistance because of apprehension

that he was sick, or for any reason unable to care for himself. All the evidence showed that the persons who warned him of his peril and advised him to get up from the crosstie and leave, left him sitting on the crosstie, fully conscious of his perilous situation.

W. L. Hardin, Jr., the only witness who testified that he saw plaintiff's intestate immediately before he was struck and killed by the train, testified as follows:

"I live in Waynesville. I am sales agent of the Standard Oil Company. My office is near the track of the Southern Railway Company. I am familiar with the track from the station in Waynesville to the station in Hazelwood. It is used constantly by the public as a walkway. It is straight from the station in Waynesville in a westerly direction for a distance of over 3,000 feet. There are no obstructions on or near the track which prevent a person on the track from seeing a train approaching the station in Waynesville from the west for a distance of more than 3,000 feet.

"I knew Joe Lemings. I saw him from my office sitting on a crosstie in the track of the Southern Railway Company on the afternoon of 9 March, 1936. When I came out of my office and first saw him, he was at an angle from me—a distance of about 150 feet. He was sitting on the crosstie in a leaning position, with his elbows on his knees, and his hands between his knees. His left side was turned toward me. I did not pay any particular attention to his arms. I did not have time to do so. I saw the train coming from the west. It was coming at a speed of 40 to 45 miles per hour. It was about 160 feet from where Joe Lemings was sitting on the crosstie. The engineer was trying to stop the train. He had put on his brakes. I saw sparks of fire on the track, under the wheels of the engine. I did not see the train strike Joe Lemings. After it struck him I went to the place where I had seen him before he was struck. His body was beside the track. He was dead. The train stopped after it struck him at a distance of 160 to 180 feet.

"When I saw Joe Lemings sitting on the crosstie, before he was struck by the train, there was nothing about him to indicate that there was anything the matter with him. He was just sitting on the crosstie, leaning over, with his feet on the ground, his elbows on his knees, and his hands between his knees. The engineer on defendant's train could have seen him in that position for a distance of at least 3,000 feet."

The issues submitted to the jury were answered as follows:

"1. Was the plaintiff's intestate injured and killed by the negligence of the Southern Railway Company, as alleged in the complaint? Answer: 'Yes.'

"2. Was the plaintiff's intestate injured and killed by the negligence of the defendant C. Burt, as alleged in the complaint? Answer: 'Yes.'

"3. Was the plaintiff's intestate injured and killed by the negligence of the defendant D. H. Call, as alleged in the complaint? Answer: 'Yes.'

"4. Did the plaintiff's intestate, by his own negligence, contribute to his own injury and death, as alleged in the answer? Answer: 'Yes.'

· "5. Notwithstanding such negligence on the part of plaintiff's intestate, could the defendants, by the exercise of ordinary care, have avoided the injury and death of plaintiff's intestate? Answer: 'Yes.'

"6. What damage, if any, is plaintiff entitled to recover? Answer: '$2,500.' "

From judgment that plaintiff recover of the defendants and each of them the sum of $2,500 and the costs of the action, the defendants appealed to the Supreme Court, assigning errors in the trial.

*J. Hayes Alley and F. E. Alley, Jr., for plaintiff.*
*Jones & Ward and R. C. Kelly for defendants.*

CONNOR, J. As we are of the opinion that there was error in the refusal of the trial court to allow defendants' motion, at the close of all the evidence, for judgment as of nonsuit (C. S., 567), we shall not discuss assignments of error on this appeal, presenting defendants' contentions that there was error in the admission of evidence offered by the plaintiff, in the exclusion of evidence offered by the defendants, and in the charge of the court to the jury. Conceding, without deciding, that neither of these assignments of error can be sustained, we are of opinion that there was error in the refusal of defendants' motion for judgment as of nonsuit, and that for this reason the judgment should be reversed, and that the action should be dismissed.

Conceding, as contended by the plaintiff, that there was no error in the trial of this action with respect to the first, second, third, or fourth issue, we find no evidence in the record tending to support an affirmative answer to the fifth issue. In view of the answer to the fourth issue, the judgment is supported only by the affirmative answer to the fifth issue. There was no evidence tending to show that plaintiff's intestate as he sat on the crosstie, and as the train approached him, was at any time in a helpless or even an apparently helpless condition. For this reason the principle on which the doctrine of the "last clear chance" is founded is not applicable to this case. See *Reep v. R. R.,* 210 N. C., 285, 186 S. E., 318; *Stover v. R. R.,* 208 N. C., 495, 181 S. E., 336; *Rives v. R. R.,* 203 N. C., 227, 165 S. E., 709. In *Reep v. R. R., supra,* it is said: "All that the evidence discloses is that the intestate was sitting on the crosstie, with his head resting upon the extended fingers of his right hand. This was not sufficient to put the engineer upon notice that the

intestate would not get off of the track before the engine reached and struck him. There was no evidence that any disability of the intestate was known or was apparent to the engineer. The engineer therefore had a right to assume up to the last moment that the intestate would get off of the track." In that case, a judgment for the plaintiff was reversed for error in submitting to the jury an issue involving the principle on which the doctrine of the "last clear chance" is founded. The instant case cannot be distinguished from that case.

This case is distinguishable from *Jenkins v. R. R.*, 196 N. C., 466, 146 S. E., 83. In that case it is said: "There was evidence that deceased could not have been seen by a person on the train at a greater distance than about 400 feet, because of a curve in the track; that deceased had gone upon the track as a licensee, and while lawfully walking thereon had become suddenly ill, and for that reason had sat down upon the end of a crosstie; that he was sitting there as the defendant's train approached him in an apparently unconscious and therefore helpless condition, and that the train which was moving at a rate of speed not less than fifteen miles per hour, could not have stopped at that point within less than 600 feet." In that case a judgment dismissing the action as of nonsuit was reversed.

In the instant case, there was no evidence tending to show that the deceased was in a helpless condition at any time after he sat down on the end of the crosstie until he was struck and killed by defendant's train. All the evidence showed that defendant's engineers saw the deceased as he sat on the end of the crosstie, and gave ample warning to him of the approach of the train. When the engineers realized that the deceased continued to sit on the crosstie, and failed to heed their warning, they put on the brakes of their engines, and exerted themselves to the utmost of their ability to stop the train and avoid striking the deceased. It was then too late. The proximate cause of the injuries and death of plaintiff's intestate was his negligence, which continued up to the moment when he was struck by defendant's train. On all the facts shown by the evidence, the doctrine of "the last clear chance" cannot be invoked in this case.

There was error in the refusal of defendants' motion at the close of all the evidence, for judgment as of nonsuit. The judgment is

Reversed.

CLARKSON, J., dissenting: The evidence: The track from the point where plaintiff's intestate was sitting, in a westerly direction, for a distance of about 3,000 feet, was straight. Shortly before he sat down on the crosstie, while he was walking on the track plaintiff's intestate staggered between the rails of the track. After he sat down, he leaned over,

with his elbows on his knees, and with his head between his hands. He remained in that position until this carpenter by trade was struck and killed by the train.

The killing was in daylight, about 5:30 o'clock p.m., and within the corporate limits of the town of Waynesville. The train was traveling between 40 and 50 miles per hour, in violation of an ordinance of the town of Waynesville, which prescribed a maximum speed for trains operated within the corporate limits of said town of six miles per hour. No effort was made to lower the speed of the train until within about 160 feet of where plaintiff's intestate was sitting and where he was struck and killed by the train.

In *McArver v. R. R.,* 129 N. C., 380 (384), we find: "Engineers in charge of moving trains are required by the decisions of this Court to exercise reasonable care in observing the track, keeping a diligent lookout for obstructions of any kind, including cattle, horses, and hogs, and also persons who may be helpless or unconscious, or both. And this lookout is not only for the safety of the passengers on the train, but also for the protection of cattle, etc., and of those persons who may be in the condition and situation as just described. If, therefore, an engineer, in the omission of the requirement to keep a vigilant outlook fails to see such a person on the track, or so near to it as to be in peril from a passing train, and could have, by the use of his appliances, prevented the injury, and failed to do so, then he would be also guilty of negligence," citing authorities.

In *Holman v. R. R.,* 159 N. C., 44 (45), it is said: "A man lying on the track or sitting on the end of a crosstie at the point where the plaintiff's body was found could be seen under the headlight of the engine 125 yards, and the defendant's train that night could have been stopped within that distance from the spot, if running at the rate of not over 8 miles per hour, the speed allowed by the ordinance." At p. 46 we find: "In *Snipes v. Mfg. Co.,* 152 N. C., 42, the Court says: 'It is well established that the employees of a railroad company in operating its trains are required to keep a careful and continuous outlook along the track and the company is responsible for injuries resulting as the proximate consequence of their negligence in the performance of their duty,'" citing numerous authorities. *Triplett v. R. R.,* 205 N. C., 113.

In *Neal v. R. R.,* 126 N. C., 634 (638), it is written: "These cases hold that it is not negligence on a railroad company where its train runs over a man walking on the railroad track, apparently in possession of his faculties, and in the absence of any reason to suppose that he was not. This is put upon the ground that the engineer may reasonably suppose that the man will step off in time to prevent injury."

Right or wrong, this Court has consistently followed the doctrine in the *Neal case, supra,* but there are many exceptions to this rule. In *Ray v. R. R.,* 141 N. C., 84, *Hoke, J.,* said: "The authorities are to the effect that if the plaintiff is at the time rightfully upon the track or sufficiently near it to threaten his safety, and is negligent, and so brought into a position of peril, if the defendant company by taking a proper precaution and keeping a proper lookout could have discovered the peril in time to have averted the injury by the exercise of proper diligence, and negligently fails to do it, the defendant would still be responsible, though the plaintiff also may have been negligent in the first instance." These exceptions are to the effect that persons on the track asleep, drunk, helpless, or unconscious, or in a position oblivious to danger, recovery can be had for the negligence of the railroad.

The following is said in *Threadwell v. R. R.,* 169 N. C., 694 (701): "If deceased were asleep on the track, or otherwise helpless, he was negligent, but it was the duty of the defendant's engineer, after discovering his dangerous position, to have exercised ordinary care in saving him from harm, and it was further his duty, under our decisions, to keep a reasonably careful lookout so as to discern any person who may be on the track in a helpless condition. *Arrowood v. R. R. Co.,* 126 N. C., 629; *Gray v. R. R.,* 167 N. C., 433; *Cullifer v. R. R. Co.,* 168 N. C., at p. 311."

All the evidence in the present case is to the effect that the plaintiff's intestate was sitting on the crossties, leaning over, with his elbows on his knees and with his head between his hands. It was daylight and the engineer could have seen him for 3,000 feet, and could have stopped his train in plenty of time to have saved the life of plaintiff's intestate by keeping a proper lookout, as it was his duty to do. It may be that plaintiff's intestate was overcome by illness as he sat on the crosstie with his elbows on his knees and his head between his hands.

In *Wilson v. R. R.,* 90 N. C., 69, at pp. 73-4, it is said: "The evidence, including that of the engineer, went to show that the railroad was straight, passing through an open field for a long distance in the neighborhood where the mule was killed. It was about one o'clock in the day, and the engineer could, by reasonable diligence, easily have seen the mule on the road one-half or three-quarters of a mile ahead of the engine; he saw it on the road half a mile ahead and gave the alarm. The evidence is conflicting as to whether or not the speed of the train was slackened; it was moving at about the rate of fifteen miles per hour; the mule ran off, then on the road, and was killed by the engine. Now, if these facts were true, or substantially true, and nothing else appeared, the presumption of negligence was not repelled. Indeed, there was manifest negligence. It was the plain duty of the engineer to slacken the speed, and, if need be, stop the train. In this aspect of the case, the

court instructed the jury that 'if the engineer saw the mule upon the track a quarter or a half mile ahead, or could have seen it running on the track, by proper watchfulness, and could have stopped the train before reaching the point where it was killed, then the defendant was guilty of negligence, and the plaintiff was entitled to recover the value of the mule.' There was evidence tending to prove the case as supposed in this charge, and the plaintiff contended that the evidence proved it. The charge in that view was correct, and is fully sustained by repeated decisions of this Court," citing authorities. At p. 75: "It may be conceded that where cattle are quietly grazing, resting, or moving near the road— not on it—and manifesting no disposition to go on it, the speed of the train need not be checked, but the rule is different where the cow or mule is on the road and runs on, then off, along, near to, and back upon it. In such a case, reasonable diligence and care require that the engineer shall slacken the speed, keep the engine steadily and firmly under his control, and, if need be, stop it until the danger shall be out of the way."

In *Snowden v. R. R.,* 95 N. C., 93, it was held: "Where a horse was feeding within three feet of a railroad track, in plain view of the engineer, who did not slacken the speed of the train, or take other precautions, until the train was within close proximity to the horse, and he had gotten upon the track, it was held negligence."

In *Lewis v. Norfolk Southern R. R. Co.,* 163 N. C., 33, it was held: "A flock of turkeys are not as alert to danger as cattle, horses, or other more intelligent creatures, though more quickly alarmed by a sudden sharp sound, as the whistle of an approaching railroad locomotive. Hence, the failure of the engineer to blow the whistle of the locomotive when he sees turkeys feeding on or across the track, or should have seen them by a proper lookout, is actionable negligence. The jury may consider the known characteristics of a turkey to run or fly at a sudden sound upon the question as to whether the failure to blow the whistle, under these circumstances, was the proximate cause of the damage inflicted by the train running into them."

The engineers in the above quoted cases were required to stop to save the lives of mules, horses, and turkeys when on the track, but under the decision in this case, not a human being. It is the age-old cry, when another son of a carpenter said: "How much then is a man better than a sheep." Matthew, 12th chapter, part verse 12.